J-A16024-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 246 EDA 2022 |

Appeal from the Order Entered December 16, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000515-2021

BEFORE:   McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:                    **FILED AUGUST 18, 2022**

K.C. (Mother) appeals from the order of adjudication and disposition and the aggravated circumstances order,[1] both entered on December 16, 2021, in the Court of Common Pleas of Philadelphia County, adjudicating dependent her daughter, A.C. (Child), born in January 2020, determining that Child was a victim of "child abuse" as to Mother pursuant to 23 Pa.C.S. § 6303(b.1), and

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note that, in her notice of appeal, Mother states she is appealing from "**the** decree/order dated December 16, 2021[,]" which implies one order. Mother's Notice of Appeal, 1/15/20 (emphasis added).  However, she further describes the "order" as adjudicating her child dependent, finding Mother committed "child abuse," directing no reasonable efforts be made to reunify Mother with her child, and suspending all visitation between Mother and her child.  ***See id.***  Upon our review of the record, it is evident Mother is challenging **both** the order of adjudication and disposition **and** the aggravated circumstances order, which bear the same docket number, and were entered on the same day, December 16, 2021, following a single hearing.

finding aggravated circumstances exist as to Mother.[2]  Mother also challenges the court's suspension of her visitation in an amended order entered on December 22, 2021.  Upon careful review, we affirm.

The record reveals the following factual and procedural history.  On May 10, 2021, the Philadelphia Department of Human Services (DHS) received a Child Protective Services report alleging physical abuse of 16-month-old Child by Mother and her former paramour, K.P., through recent acts/failure to act.[3]  N.T. Child Abuse H'rg, 12/16/22, at 11-12.  On May 11, 2021, DHS assigned Sharina Johnson, a social worker, to investigate the report.  *Id.* at 12.  That same day, Ms. Johnson went to St. Christopher's Hospital to observe Child.  *Id.* at 13.  Ms. Johnson related that "[Child] was sedated.  She was asleep.  [The] majority of her body was cast."  *Id.*  Ms. Johnson spoke with hospital staff regarding Child's injuries.  *Id.*  Ms. Johnson was made aware that Child's injuries were in multiple stages of healing; some of Child's injuries were acute, and some were "two to three weeks old."  *Id.* at 19.

---

[2] The biological father of Child, D.B. (Father), is currently incarcerated.  Father did not attend the adjudication hearing, but he was represented by counsel at the hearing.  On December 16, 2021, the trial court provided Father with goals for reunification and scheduled an initial permanency review hearing for March 10, 2022.  Father did not file a notice of appeal or participate in the instant appeal.

[3] Mother and K.P. had been in a relationship, but they broke up in March 2021 due to domestic violence.  N.T. Child Abuse H'rg at 22.  K.P. allegedly yelled at Mother and hit her.  *Id.* at 45.  However, K.P. offered to continue babysitting Child and Mother accepted.  *Id.* at 23-24.  K.P. babysat Child every other weekend, "normally . . . Friday to Sunday."  *Id.* at 24.

Due to the extent of Child's injuries, Child was seen by Dr. Michelle Dominguez, a child abuse pediatrics attending physician. N.T. Child Abuse H'rg at 53, 60-61. Dr. Dominguez testified that Child had multiple injuries. She explained:

> So, the initial injuries on my physical exam included the subconjunctival hemorrhage, the chest bruising, the bilateral upper extremity bruising and shoulder bruising.
>
> On physical exam, [Child] also had an area of swelling that you could see on exam of the great clavicle, as well as the right thigh swelling, like we said. And . . . on the CT imaging that we had, [Child] was noted to have multiple abdominal injuries, including liver lacerations on labs and on imaging, pancreatic injury.
>
> [Child] had suspected . . . intestinal injury and suspected bladder injury that we then had, essentially, further imaging to determine that she didn't have blood in the urine. [Child] had suspected pericardial injury, and then she had multiple fractures that were both determined during her initial evaluation, as well as . . . afterwards.

*Id.* at 65-66. Further testing confirmed the suspected injuries. *Id.* at 66-68, 82-84. When asked what part of the body the fractures were in, Dr. Dominguez indicated "all of her" and stated that the fractures occurred over an extended period of time, noting "some appeared acute, and some were healing." *Id.* at 66-67. Child had a healing right clavicle fracture, multiple rib fractures on both sides, healing right radius and left ulna fractures, acute right femur fracture, and a left femur fracture. *Id.* Dr. Dominguez confirmed that the injuries were "consistent with inflicted trauma, with child physical abuse." *Id.* at 75. Dr. Dominguez also related that the intra-abdominal

injuries Child suffered have "a very high mortality rate" in children. *Id.* at 70, 83.

Through her investigation, Ms. Johnson was able to determine the primary caregivers of Child and provided a timeline of who was responsible for Child from Friday, May 7, 2021, to Monday, May 10, 2021. K.P. picked up Child from daycare on Friday, May 7th while Mother was working. N.T. Child Abuse H'rg at 16, 36. That evening, after work, Mother went to K.P.'s aunt's house, where K.P. resides, to celebrate K.P.'s birthday. *Id.* at 16, 36-37. Mother and Child spent Friday night at K.P.'s house and Saturday afternoon Mother went back to work and left Child with K.P. *Id.* at 16-17, 37. Mother returned to K.P.'s house after her shift on Saturday, but left for work on Sunday, again leaving Child in the care of K.P. *Id.* at 17-18, 38. Mother returned Monday morning to pick up Child for daycare. *Id.* at 18, 38. K.P. had left Child, who was fully dressed, sitting alone on the couch because Mother did not arrive before K.P. had to leave for work. *Id.* at 38-39. Soon after Mother dropped Child off at daycare, staff at the daycare noticed bruising and swelling on Child, Child cried when staff touched places on her body, and Child threw up blood. *Id.* at 39-40, 60. Accordingly, on Monday, May 10th, Child was brought to St. Christopher's Hospital *via* emergency medical services with her daycare supervisor. *Id.* at 59.

The following day, Ms. Johnson asked Mother about Child's injuries, and Mother told Ms. Johnson that she did not know what happened. N.T. Child Abuse H'rg at 16. Mother told Ms. Johnson that Child seemed fine, and Mother

- 4 -

did not observe any injuries to Child. *Id.* at 16, 19. The same day, Ms. Johnson also interviewed K.P. *Id.* at 25. Similar to Mother, K.P. was not aware of Child's injuries. However, "he did report that [Child] fell off of the couch when he went to the bathroom." *Id.* Ms. Johnson also spoke to K.P.'s aunt, F.P., who was in the home that weekend, and F.P. told Ms. Johnson that there were no issues with Child. *Id.* at 26. Further, F.P. was adamant that she was not responsible for Child. *Id.* at 27.

On May 21, 2021, DHS obtained an Order of Protective Custody (OPC) for Child. N.T. Child Abuse H'rg at 32; Trial Ct. Op., 2/24/22, at 6. At the May 24, 2021, shelter care hearing, the trial court lifted the OPC and ordered Child's temporary commitment to DHS to stand. Trial Ct. Op. at 6. Following the shelter care hearing, Community Umbrella Agency (CUA) case manager Kasey Roscoe referred Mother to housing and domestic violence services. N.T. Child Abuse H'rg at 103-04. Additionally, the Juvenile Court Hearing Officer recommended that Mother have "line of sight supervised visits with [C]hild[,]" a recommendation the trial court adopted in its shelter care order. *See* Recommendation for Shelter Care, 5/24/21, at 1; Order, 5/24/21.

On June 7, 2021, DHS filed a dependency petition for Child. The evidentiary hearing occurred on December 16, 2021, at which time Child was nearly two years old.[4] Child was represented by a guardian *ad litem*. DHS

---

[4] Pursuant to the Juvenile Act, if the child is in shelter care, the dependency hearing "shall not be later than ten days after the filing of the" dependency
*(Footnote Continued Next Page)*

presented the testimony of DHS social worker Ms. Johnson, child abuse pediatrics physician Dr. Michelle Dominguez, and CUA case manager Ms. Roscoe. Ms. Roscoe testified that although Mother visited Child, other than attending an intake appointment, Mother did not participate in the referrals for service. N.T. Child Abuse H'rg at 103-04. Mother, who was represented by counsel, did not appear for the hearing.

By order dated and entered December 16, 2021, the trial court adjudicated Child dependent, and found Mother committed "child abuse" as defined by 23 Pa.C.S. § 6303(b.1). By separate order, the court entered a finding of aggravated circumstances and indicated that DHS need not provide reunification services for Mother. The order further stated that no efforts are to be made to preserve the family and reunify Child with Mother.[5] Finally, the trial court entered an amended order on December 22, 2021, docketed on December 27th, correcting the adjudication order by suspending Mother's

_____

petition. 42 Pa.C.S. § 6335(a). The trial court initially scheduled the adjudicatory hearing for July 8, 2021, approximately one month after DHS filed the petition. On that date, the court continued the matter by request, to have an appropriate contested time slot to properly address multiple witnesses. The court rescheduled the hearing for September 15th, but the court continued the proceeding again because the guardian *ad litem* was on the call out sheet. At that time, the court rescheduled the hearing for December 16th.

[5] Despite the aggravated circumstances order, the permanency goal for Child remained reunification. The adjudication order provided Father with various goals and scheduled a subsequent hearing for permanency review.

visitation.[6]   On January 15, 2022, Mother timely filed a notice of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[7]   The trial court filed its Rule 1925(a) opinion on February 24, 2022.

On appeal, Mother raises the following issues:

1) Was there insufficient evidence for the [trial] court to make a finding of child abuse against . . . Mother?

2) Was there insufficient evidence for the [trial] court to order [DHS] not to make reasonable efforts to reunify [C]hild with Mother?

3) Did the [trial] court properly rule that no objectives were to be set for Mother?

4) Did the [trial] court err in suspending Mother's visits with [C]hild indefinitely?

Mother's Brief at 9.

Our standard of review for dependency cases is as follows.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility

_____

[6] In the December 16, 2021, adjudication order the trial court mistakenly included a provision allowing Mother visitation with Child.  The amended order provided that, because no efforts are to be made to reunify Child with Mother, her visitation with Child is suspended.  Order, 12/27/21.

[7] That same day, Mother filed a motion for reconsideration in which she stated that at the time of the hearing, she had been "consistently working overnight and overslept."  Mother's Motion for Reconsideration, 1/15/20, at 1 (unpaginated).  She averred she had been in contact with both CUA and her counsel and "regrets not appearing for the hearing."  *Id.*  Mother requested the court grant reconsideration and schedule a hearing so that she could address the abuse allegations.  *See id.* at 2 (unpaginated).  The trial court did not rule on Mother's motion, which she filed the same day as her notice of appeal.  Thus, it is deemed denied.  *See* Pa.R.C.P. 1930.2(b); Pa.R.A.P. 1701(b)(3).

determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Our Supreme Court has explained that, "a petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations. . . ." *In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). This Court has stated that "clear and convincing evidence" requires

> that the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

*In the Interest of J.M.*, 166 A.3d 408, 423 (Pa. Super. 2017) (citation omitted).

Section 6303 of the Child Protective Services Laws (CPSL) defines "child abuse" as, *inter alia*:

> **(b.1) Child abuse. —** The term "**child abuse**" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> > (1) Causing bodily injury to a child through any recent act or failure to act.
>
> > \* \* \*
>
> > (7) Causing serious physical neglect of a child. . . .

- 8 -

23 Pa.C.S. § 6303(b.1)(1), (7).   In addition, Section 6303 defines "bodily injury" as "[i]mpairment of physical condition or substantial pain."  23 Pa.C.S. § 6303(a).

In certain situations, "the identity of the abuser need only be established through *prima facie* evidence[.]"  *L.Z.*, 111 A.3d at 1174.  *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient."  *Id.* at 1185 (citation omitted).  Section 6381(d) of the CPSL provides:

> **§ 6381. Evidence in court proceedings.**
>
>        *     *     *
>
> **(d)  Prima facie evidence of abuse.** — Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child. . . .

23 Pa.C.S. § 6381(d).  The *L.Z.* Court held:

> [E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption.  The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive.  The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

*L.Z.*, 111 A.3d at 1185 (footnote omitted).

Mother does not contest the finding of dependency or the finding of abuse. However, in her first issue, Mother argues that she cannot be held responsible for the abuse that occurred. Mother's Brief at 13. She insists that "[b]ecause [C]hild was in the care of different caretakers, it could not be said whether Mother was responsible for the welfare of [C]hild at the time of the injuries." *Id.* at 14. Mother further maintains that because Child was fully clothed when she picked up Child for daycare on Monday morning, "there is no evidence that [she] would have known of the injuries." *Id.* Mother contends that *In re Interest of N.B.-A.*, 224 A.3d 661 (Pa. 2020), is instructive. *Id.* In that case, our Supreme Court reversed a finding of abuse where there was no evidence the mother committed or would have known of the abuse. Mother's Brief at 14. Mother argues that there is no evidence that she knew of the abuse insofar as the signs of injuries referenced by Dr. Dominguez "cannot be sufficient to put a parent on notice that their child is being abused." *Id.* at 15. We disagree.

In the instant case, the trial court made credibility determinations in favor of all the DHS witnesses[8] and found:

> Based upon the testimony of the [e]xpert [w]itness, Dr. Dominguez, and the testimony of the DHS Investigator and [c]ase [w]orker, this [c]ourt found that the condition of [C]hild constituted "child abuse" justifying a finding of [a]buse under 23 Pa.C.S. § 6303(b.1), (1), and (7). The medical evidence was clear

---

[8] *See* Trial Ct. Op. at 12, 15, 21.

- 10 -

and convincing regarding the life-threatening condition of [Child's] injuries at the time she was brought by daycare staff to St. Christopher's Hospital for Children and the evidence was also clear and convincing that [Child] suffered other injuries that were in stages of healing. This [c]ourt also found the evidence clear and convincing that both Mother and [K.P.] were primary caregivers of [C]hild, and that DHS established a prima facie case that both Mother and K.P. were perpetrators of [c]hild [a]buse.

Trial Ct. Op. at 22-23 (footnoted omitted). Furthermore, at the hearing, the trial court related:

[T]he vast scope of the evidence reflects that there were multiple injuries caused over multiple periods of time, injuries that -- such as the fracture of a clavicle, fracture of the femur -- which was easily noticeable -- easily noticeable bruises, all of the other internal injuries.

These injuries were not inflicted during that short period of time. And, even during that short period of time, both [Mother and K.P.] were responsible because [M]other left [C]hild in [K.P.'s] care more often than she had [C]hild in her care.

N.T. Child Abuse H'rg at 118-19. The trial court continued:

So, I'm finding child abuse against both [K.P.] and [Mother], and I'm also finding aggravated circumstances because, when taken together, the multiple injuries, the scope of the injuries, the type of injuries, the potential for these injuries to result in a fatality, it's clear that [C]hild, by the grace of God, is still alive.

*Id.* at 119-20.

We discern no abuse of discretion. As referenced *supra*, Child suffered serious, noticeable injuries all over her body. N.T. Child Abuse H'rg at 66-67. Dr. Dominguez testified to extensive bruising on Child and swelling in Child's right leg due to an acute femur fracture. *Id.* at 62-64. Dr. Dominguez testified that Child's injuries were uncommon for a child that age, were not caused by any possible medical condition or fall, and were "consistent with

inflicted trauma, with child physical abuse." *Id.* at 74-75. Additionally, the testimony revealed that Mother and K.P. were the only primary caretakers for Child. *Id.* at 28. Although Mother contends that it could not be determined whether she was responsible for Child at the time of the injuries, Dr. Dominguez determined that the injuries to Child could not have been caused by a single event. *Id.* at 87. Dr. Dominguez opined that the healing injuries occurred at least a week earlier, and, likely, "within a couple of weeks" prior to the time of her examination on May 10, 2021. *Id.* at 73. Even if Mother did not see the extensive bruising or swollen right leg that occurred over the weekend before Child arrived at the hospital, Dr. Dominguez indicated that many of Child's injuries would have been very painful, that Child would have been "immediately symptomatic[,]" and it was not possible that an adult caregiver would have been "unaware of the injuries[.]" *Id.* at 62-64, 71-72, 79-80.

The evidence presented clearly indicates that Mother, at the very least, should have known about Child's injuries. However, Mother consistently denied observing any symptoms and provided no explanation for what happened to Child other than that K.P. took care of Child over the weekend before Child was taken to the hospital. Even if Mother did not notice Child's injuries on the way to daycare on Monday, May 10th, Child had already suffered extensive injuries of which Mother should have been aware prior to that weekend.

As such, this case is distinguishable from **N.B.-A., supra**, where there was no record evidence that, prior to the initial visit to the hospital, the child in that case exhibited "any injury that would or should have put [the m]other on notice that [the c]hild had been sexually abused." **N.B.-A.**, 224 A.3d at 670.

Finally, the court found significant the fact that Mother did not even appear for the adjudicatory hearing to rebut the statutory presumption. CUA case manager Ms. Roscoe, testified that Mother was aware of the hearing:

> [DHS counsel]: Okay. And is [Mother] aware of court today?
>
> [Ms. Roscoe]: Yes.
>
> [DHS counsel]: And do you know why she is not present today?
>
> [Ms. Roscoe]: She text[ed] me at 1:45, stating that she just woke up, so, she wouldn't be able to get here in time.

N.T., 12/16/2021, at 105.[9] The trial court applied "a negative inference because of [Mother's] failure to come in . . . and testify and support her defense." **Id.** at 119. Thus, Mother's first issue fails.

Due to the similarity of Mother's second and third issues, we review them together. Mother argues that even "[i]n a case where the presumption [of child abuse] applies, [but] there is no evidence that the parent . . . actually inflicted the abuse, to order no reasonable efforts is inconsistent with the mandate to preserve the unity of the family." Mother's Brief at 15-16. Mother

---

[9] The child abuse hearing began at 2:00 p.m. **See** N.T. Child Abuse H'rg at 3.

notes that she regularly attended visitation with Child during the approximately seven months from the time of the shelter care hearing until the subject proceeding, and "that a bond existed between [her] and [C]hild[.]" *Id.* at 16. Thus, she maintains that "[f]or the court to order no reasonable efforts to reunify is not in the best interests of [C]hild." *Id.* Mother also emphasizes the fact that the trial court denied DHS's request to refer her to the Clinical Evaluation Unit. *Id.* She argues that she can, on her own initiative, "make her own efforts to meet the objectives posed to her by the court." *Id.* at 17. Mother insists that the trial court essentially terminated her rights at the dependency stage. *Id.* Nevertheless, we note that Mother does not argue the trial court erred in finding aggravated circumstances existed. For the reasons that follow, we discern no abuse of discretion.

The Juvenile Act provides that, if a trial court determines that a child is dependent, and aggravated circumstances have been alleged by the county agency or the child's attorney, the court must also determine whether aggravated circumstances exist. *See* 42 Pa.C.S. § 6341(c.1). If the court determines that aggravated circumstances do exist, it must then consider whether reasonable efforts should be made to reunify the child with their parent or parents. *Id.* Following a finding of aggravated circumstances, a trial court may — in its discretion — end reasonable efforts. *See In re L.V.*, 127 A.3d 831, 839 (Pa. Super. 2015) (citation omitted).

The Juvenile Act provides "aggravated circumstances" exist when, *inter alia*, "[t]he child or another child of the parent has been the victim of physical

- 14 -

abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent." 42 Pa.C.S. § 6302. The Act further defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Id.*

At the close of the hearing, the trial court stated, "I think, if I find the child abuse, then the aggravated circumstances are already found, implicit in the degree of injury of [C]hild and the uncontradicted testimony that this was a near fatality." N.T. Child Abuse H'rg at 112-13. As related *supra*, the trial court determined, and our review of the record confirms, that Mother was a perpetrator of "child abuse" against Child. Child's injuries were extensive, severe, and occurred, at a minimum, over the course of a couple of weeks. Moreover, other than attending an intake appointment, Mother did not participate in the referrals for housing and domestic violence services made by CUA case manager Ms. Roscoe. *Id.* at 103-04. Although Mother did participate in supervised visitation, she did not appear for the adjudicatory hearing because she overslept. *Id.* at 105. Due to the number of injuries over an extended time period; the uncontroverted testimony that Child's injuries resulted in a near fatality; Mother alleged being unaware of Child's injuries; the fact that Mother did not even appear for the dependency hearing; and Mother did not participate in CUA's referrals, the trial court found aggravated circumstances and was well within its discretion to order no

reasonable efforts be made to reunify Child with Mother. Accordingly, Mother's second and third issues do not warrant relief.

In her final claim, Mother argues the trial court abused its discretion by suspending her visitation with Child indefinitely. Mother's Brief at 19. She asserts that the trial court never made a finding that visitation would pose a "grave threat" to Child, which is the proper standard when, as here, reunification remains the goal. *Id.* at 18-19. Mother contends that, although the abuse was serious, no evidence exists that she caused Child's injuries. *Id.* In addition, Mother maintains that, to the extent the trial court had concerns with her leaving Child in the care of K.P., suspending her visitation is not narrowly tailored to address the concern. *Id.* Finally, Mother insists the court's decision to suspend visitation was punitive, and based upon her failure to attend the hearing, rather than addressing specific concerns that existed with Child. *Id.* at 20.

In dependency cases, where reunification remains the goal, parental visitation of the child may not be denied or reduced unless it poses a grave threat to the child. *See In re C.J.*, 729 A.2d 89, 95 (Pa. Super. 1999). However, where the permanency goal is no longer reunification, the court may suspend, limit, or deny visitation, if it is in the best interests of the child to do so. *See id.* ( "The 'best interests' standard, in this context, is less protective of parents' visitation rights than the 'grave threat' standard"). In *In re C.B.*, 861 A.2d 287 (Pa. Super. 2004), this Court explained,

The "grave threat" standard is met when the evidence clearly shows that the parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

*Id.* at 294 (citations and some quotations marks omitted).

Here, Child's permanency goal remained reunification, therefore, the "grave threat" standard was applicable. We conclude the trial court did not abuse its discretion when it suspended Mother's visitation. At the hearing, the trial court related,

So, I'm finding child abuse against both [K.P.] and [Mother], and I'm also finding aggravated circumstances because, when taken together, the multiple injuries, the scope of the injuries, the type of injuries, the potential for these injuries to result in a fatality, it's clear that [C]hild, by the grace of God, is still alive.

N.T. Child Abuse H'rg at 119-20. Additionally, in its opinion, the trial court stated, "The medical evidence was clear and convincing regarding the life-threatening condition of [Child's] injuries at the time she was brought by daycare staff to St. Christopher's Hospital for Children and the evidence was also clear and convincing that [Child] suffered other injuries that were in stages of healing." Trial Ct. Op. at 22-23. Finally, when counsel for DHS requested that no efforts for reunification be made, the trial court stated:

I think that's a fair request because, in many ways, this is the most important day in the life of [C]hild and [M]other, and [M]other blithely and glibly calls her lawyer and says, "I got up too late. I won't be there."

N.T. Child Abuse H'rg at 120.

- 17 -

The record supports the trial court's findings. As discussed **supra**, Child, at 16 months old, suffered numerous injuries that resulted in a near fatality. The uncontradicted evidence demonstrated that Mother was a primary caregiver of Child, Mother should have at least known of the injuries Child suffered, and Mother provided no explanation for how the injuries occurred. Dr. Dominguez testified regarding the severity and extent of Child's injuries and confirmed that a primary caregiver would have noticed symptoms from these injuries. **Id.** at 66-68, 70-73. Even assuming that K.P. directly caused Child's injuries, Mother either knew of them, or should have known, insofar as many of the injuries were inflicted at least one week before Child was admitted to St. Christopher's Hospital. In either event, Mother failed to obtain medical treatment for Child.

Finally, Mother alleges that she ended her relationship with K.P. due to physical abuse. Nevertheless, Mother continued to use him as a caregiver for Child. Given these findings, it is clear that Mother is "unfit to associate with" Child, and that continued visitation would pose a "grave threat" to Child's well-being. **See C.B.**, 861 A.2d at 294. Therefore, the trial court did not abuse its discretion.

Because we conclude that none of Mother's issues entitle her to relief, we affirm the orders of the trial court.

Orders affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 8/18/2022*